**MELONI & McCAFFREY, P.C.**
ROBERT S. MELONI (RM-8087)
THOMAS P. MCCAFFREY (TPM-4057)
1350 Avenue of the Americas, Suite 3100
New York, New York 10019
Telephone:   212-957-5577
Facsimile:   800-659-3985

*Attorneys for Defendant Gordon Gano*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x

| | |
|---|---|
| BRIAN RITCHIE, individually and d/b/a VIOLENT FEMMES, : : : | |
| Plaintiff, : : | No. 07-CIV-7269 (VM) |
| - against - : : | **AMENDED ANSWER** **AND COUNTERCLAIMS** |
| GORDON GANO, individually and d/b/a GORNO MUSIC a/k/a GORNO MUSIC (ASCAP) a/k/a GORNO MUSIC PUBLISHING, : : : : | **JURY TRIAL** **DEMANDED** |
| Defendants. : | |

-------------------------------------------------------------x

Defendant Gordon Gano, individually, and doing business as Gorno Music a/k/a Gorno Music (ASCAP) a/k/a Gorno Music Publishing (collectively "Defendant"), as and for his amended answer to the complaint dated August 14, 2007 and filed August 15, 2007 (the Complaint"), and counterclaims, responds as follows:

      1.    Defendant denies knowledge or information sufficient to form a belief with respect to the allegations in paragraph 1 of the Complaint, except avers that Plaintiff and Victor Delorenzo, who were then working as a rhythm section for hire, joined Defendant's band in or about 1981, at which point they became known initially as "Gordon Gano and the Violent Femmes" and later as the "Violent Femmes."

2.      Defendant denies knowledge or information sufficient to form a belief with respect to the allegations in paragraph 2 of the Complaint, except Defendant avers that Defendant, Plaintiff and Delorenzo contracted with Slash Records in the early 1980s, and recorded at least one album for Slash including the album entitled *Violent Femmes* which was both commercially and critically successful, and that the Violent Femmes thereafter enjoyed widespread popularity.

3.      Defendant denies the allegations in Paragraph 3 of the Complaint, except avers that the membership in the band changed over time and that Guy Hoffman replaced Delorenzo and that Hoffman was then replaced by Delorenzo.

4.      Defendant admits that Plaintiff is seeking the relief stated in paragraph 4 of the Complaint but denies that Plaintiff is entitled to such relief.  To the extent that paragraph 4 call for a legal conclusion, no response is required.

5.      Defendant denies knowledge or information sufficient to form a belief with respect to the allegations in Paragraph 5 of the Complaint.

6.      Defendant admits that he is an individual residing in the state of New York and admits that he does business in this state as Gorno Music but denies the remaining allegations in Paragraph 6 of the Complaint.

7.      Defendant denies knowledge or information sufficient to form a belief with respect to the allegations in Paragraph 7 of the Complaint.  To the extent Paragraph 7 calls for a legal conclusion, no response is required.

8.      Defendant admits that Plaintiff is seeking the relief stated in paragraph 8 of the Complaint but denies that Plaintiff is entitled to such relief.  To the extent that paragraph 8 call for a legal conclusion, no response is required.

9.    Defendant denies knowledge or information sufficient to form a belief with respect to the allegations in Paragraph 9 of the Complaint.  To the extent Paragraph 9 calls for a legal conclusion, no response is required.

10.    Defendant denies knowledge or information sufficient to form a belief with respect to the allegations in Paragraph 10 of the Complaint, but admits that Defendant is physically present in the State of New York.  To the extent Paragraph 10 calls for a legal conclusion, no response is required.

11.    Defendant denies knowledge or information sufficient to form a belief with respect to the allegations in Paragraph 11 of the Complaint, but admits that Defendant is physically present in the State of New York.  To the extent Paragraph 11 calls for a legal conclusion, no response is required.

12.    Defendant admits that Plaintiff is seeking the relief stated in paragraph 12 of the Complaint but denies that Plaintiff is entitled to such relief.  To the extent that paragraph 12 calls for a legal conclusion, no response is required.

13.    Defendant denies the allegations in Paragraph 13 of the Complaint, except avers that the Violent Femmes have achieved a level of success as performers and recording artists since 1981.

14.    Defendant denies the allegations in Paragraph 14 of the Complaint, except avers that Plaintiff has performed as the Violent Femmes' bass guitar player and has co-written a nominal number of the musical compositions performed and recorded by the Violent Femmes since 1981.  Defendant further avers that Defendant was the sole author and composer of almost all of the musical compositions listed in Exhibit A to the Complaint.

15.    Defendant admits the allegations in Paragraph 15 of the Complaint.

16.    Defendant denies the allegations in Paragraph 16 of the Complaint, except avers that one of the Violent Femmes' most popular sound recordings is "Blister In The Sun," written by Defendant and originally performed by Gano when he was a solo artist in or about 1980-81.

17.    Defendant denies the allegations in Paragraph 17 of the Complaint, except avers that another one of the Violent Femmes' most popular sound recordings is "Gone Daddy Gone."  Defendant further avers that "Gone Daddy Gone" interpolates portions of the lyrics to a song entitled "I Just Want To Make Love To You," by Willie Dixon.

18.    Defendant denies the allegations in Paragraph 18 of the Complaint, except avers that, at various times since 1981, Plaintiff and Defendant were shareholders of the corporations Violent Femmes, Inc., Violent Femmes Touring, Inc., Add It Up Productions, Inc. and VF2, Inc.  Defendant further avers that on or about April 20, 2001, Plaintiff and Defendant entered into an agreement (the "2001 Agreement").  Defendant respectfully refers the Court to the 2001 Agreement for its true content, terms and meaning.  To the extent that paragraph 18 calls for a legal conclusion, no response is required.

19.    Defendant denies the allegations in Paragraph 19 of the Complaint, except avers that Defendant is the sole owner of Gorno Music.

20.    Defendant denies the allegations in Paragraph 20 of the Complaint.  To the extent that paragraph 20 calls for a legal conclusion, no response is required.

21.    Defendant denies the allegations in Paragraph 21 of the Complaint.  To the extent that paragraph 21 calls for a legal conclusion, no response is required.

22.    Defendant denies the allegations in Paragraph 22 of the Complaint.  To the extent that paragraph 22 calls for a legal conclusion, no response is required.

23.    Defendant denies the allegations in Paragraph 23 of the Complaint, except avers one of the purposes for the 2001 Agreement was to "amicably dissolve" VF2, Inc. Defendant respectfully refers the Court to the 2001 Agreement for its true content, terms and meaning.

24.    Defendant denies the allegations in Paragraph 24 of the Complaint, except avers that paragraphs 6 and 7 of the 2001 Agreement were ratified by another agreement entered into by Plaintiff and Defendant dated April 1, 2002 ("2002 Agreement").  A copy of the 2002 Agreement is attached hereto as Exhibit A.

25.    Defendant denies the allegations in Paragraph 25 of the Complaint, except admits that Plaintiff's representatives have made requests for "payments and accountings."

26.    Defendant denies the allegations in Paragraph 26 of the Complaint, and avers that Plaintiff has no legal rights to the licensing information referred to therein.

27.    Defendant denies the allegations in Paragraph 27 of the Complaint, except avers that Defendant authorized the license of the musical composition "Gone Daddy Gone" for mechanical reproduction on sound recordings embodying the performances of the artist known as Gnarls Barkley on the 2006 Album "St Elsewhere" and further avers that Plaintiff has no legal rights to the licensing information referred to therein.

28.    Defendant denies the allegations in Paragraph 28 of the Complaint. Defendant respectfully refers the Court to the "2006 E-mail" for its true content, terms and meaning.

29.    Defendant denies the allegations in Paragraph 29 of the Complaint.

30.    Defendant denies the allegations in Paragraph 30 of the Complaint, except avers that Defendant has licensed certain musical compositions that he owns to third parties.

31.    Defendant denies the allegations in Paragraph 31 of the Complaint, except avers that Defendant licensed the musical composition "Blister In The Sun" for use in a Wendy's commercial.

32.    Defendant denies the allegations in Paragraph 32 of the Complaint.

33.    Defendant responds to the allegations of paragraph 33 of the Complaint by repeating his responses to Paragraphs 1 through 32 as if fully set forth herein.

34.    Defendant denies the allegations in Paragraph 34 of the Complaint, except avers that Plaintiff purports to dispute the ownership of the musical compositions listed in Exhibit A to the Complaint.

35.    Defendant denies the allegations in Paragraph 35 of the Complaint.  To the extent Paragraph 35 calls for a legal conclusion, no response is required.

36.    Defendant denies the allegations in Paragraph 36 of the Complaint.  To the extent Paragraph 36 calls for a legal conclusion, no response is required.

37.    Defendant responds to the allegations of paragraph 37 of the Complaint by repeating his responses to Paragraphs 1 through 36 as if fully set forth herein.

38.    Defendant denies the allegations in Paragraph 38 of the Complaint, except avers that Plaintiff purports to dispute the ownership of the sound recordings listed in Exhibited A to the Complaint.

39.    Defendant denies the allegations in Paragraph 39 of the Complaint.  To the extent Paragraph 39 calls for a legal conclusion, no response is required.

40.    Defendant denies the allegations in Paragraph 40 of the Complaint.  To the extent Paragraph 40 calls for a legal conclusion, no response is required.

41.    Defendant responds to the allegations of paragraph 41 of the Complaint by repeating his responses to Paragraphs 1 through 40 as if fully set forth herein.

42.    Defendant denies the allegations in Paragraph 42 of the Complaint.  To the extent Paragraph 42 calls for a legal conclusion, no response is required.

43.    Defendant denies the allegations in Paragraph 43 of the Complaint.  To the extent Paragraph 43 calls for a legal conclusion, no response is required.

44.    Defendant denies the allegations in Paragraph 44 of the Complaint.  To the extent Paragraph 44 calls for a legal conclusion, no response is required.

45.    Defendant responds to the allegations of paragraph 45 of the Complaint by repeating his responses to Paragraphs 1 through 44 as if fully set forth herein.

46.    Defendant denies knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 46 of the Complaint.

47.    Defendant denies the allegations in Paragraph 47 of the Complaint.  To the extent Paragraph 47 calls for a legal conclusion, no response is required.

48.    Defendant denies the allegations in Paragraph 48 of the Complaint.  To the extent Paragraph 48 calls for a legal conclusion, no response is required.

49.    Defendant responds to the allegations of paragraph 49 of the Complaint by repeating his responses to Paragraphs 1 through 48 as if fully set forth herein.

50.     Defendant denies the allegations in Paragraph 50 of the Complaint, except avers that business activities of Plaintiff and Defendant were carried out for the purpose of making money.

51.     Defendant denies the allegations in Paragraph 51 of the Complaint.  To the extent Paragraph 51 calls for a legal conclusion, no response is required.

52.     Defendant denies the allegations in Paragraph 52 of the Complaint.  To the extent Paragraph 52 calls for a legal conclusion, no response is required.

53.     Defendant responds to the allegations of paragraph 53 of the Complaint by repeating his responses to Paragraphs 1 through 52 as if fully set forth herein.

54.     Defendants deny the allegations in Paragraph 54 of the Complaint, except avers that the corporate entity or entities through which they conducted business had outstanding debt at the time Plaintiff and Defendant entered into the 2001 Agreement.

55.     Defendant denies the allegations of Paragraph 55 of the Complaint, except avers that some of the proceeds from the 2001 Tour were to be used to pay down the corporate debt referred to in the 2001 Agreement.  To the extent Paragraph 55 calls for a legal conclusion, no response is required.

56.     Defendant denies the allegations of Paragraph 56 of the Complaint.

57.     Defendant denies the allegations in Paragraph 57 of the Complaint.  To the extent Paragraph 57 calls for a legal conclusion, no response is required.

58.     Defendant denies the allegations in Paragraph 58 of the Complaint.  To the extent Paragraph 58 calls for a legal conclusion, no response is required.

59.     Defendant denies the allegations in Paragraph 59 of the Complaint.  To the extent Paragraph 59 calls for a legal conclusion, no response is required.

60.    Defendant denies the allegations in Paragraph 60 of the Complaint.  To the extent Paragraph 60 calls for a legal conclusion, no response is required.

61.    Defendant denies the allegations in Paragraph 61 of the Complaint.  To the extent Paragraph 61 calls for a legal conclusion, no response is required.

62.    Defendant denies the allegations in Paragraph 62 of the Complaint.  To the extent Paragraph 62 calls for a legal conclusion, no response is required.

63.    Defendant denies the allegations in Paragraph 63 of the Complaint.  To the extent Paragraph 63 calls for a legal conclusion, no response is required.

64.    Defendant denies the allegations in Paragraph 64 of the Complaint.  To the extent Paragraph 64 calls for a legal conclusion, no response is required.

65.    Defendant denies the allegations in Paragraph 65 of the Complaint.  To the extent Paragraph 65 calls for a legal conclusion, no response is required.

66.    Defendant denies the allegations in Paragraph 66 of the Complaint.  To the extent Paragraph 66 calls for a legal conclusion, no response is required.

67.    Defendant responds to the allegations of paragraph 67 of the Complaint by repeating his responses to Paragraphs 1 through 66 as if fully set forth herein.

68.    Defendant denies the allegations in Paragraph 68 of the Complaint.

69.    Defendant denies the allegations in Paragraph 69 of the Complaint.  To the extent Paragraph 69 calls for a legal conclusion, no response is required.

70.    Defendant responds to the allegations of paragraph 70 of the Complaint by repeating his responses to Paragraphs 1 through 69 as if fully set forth herein.

71.    Defendant denies the allegations in Paragraph 71 of the Complaint.  To the extent Paragraph 71 calls for a legal conclusion, no response is required.

72.    Defendant denies the allegations in Paragraph 72 of the Complaint.  To the extent Paragraph 72 calls for a legal conclusion, no response is required.

73.    Defendant denies the allegations in Paragraph 73 of the Complaint.  To the extent Paragraph 73 calls for a legal conclusion, no response is required.

74.    Defendant denies the allegations in Paragraph 74 of the Complaint.  To the extent Paragraph 74 calls for a legal conclusion, no response is required.

75.    Defendant denies the allegations in Paragraph 75 of the Complaint.  To the extent Paragraph 75 calls for a legal conclusion, no response is required.

76.    Defendant denies the allegations in Paragraph 76 of the Complaint.  To the extent Paragraph 76 calls for a legal conclusion, no response is required.

77.    Defendant responds to the allegations of paragraph 77 of the Complaint by repeating his responses to Paragraphs 1 through 76 as if fully set forth herein.

78.    Defendant denies the allegations in Paragraph 78 of the Complaint.  To the extent Paragraph 78 calls for a legal conclusion, no response is necessary.

79.    Defendant denies the allegations in Paragraph 79 of the Complaint.  To the extent Paragraph 79 calls for a legal conclusion, no response is required.

80.    Defendant denies the allegations in Paragraph 80 of the Complaint.  To the extent Paragraph 80 calls for a legal conclusion, no response is required.

81.    Defendant responds to the allegations of paragraph 81 of the Complaint by repeating his responses to Paragraphs 1 through 80 as if fully set forth herein.

82.    Defendant denies the allegations in Paragraph 82 of the Complaint.  To the extent Paragraph 82 calls for a legal conclusion, no response is required.

83.    Defendant denies the allegations in Paragraph 83 of the Complaint.  To the extent Paragraph 83 calls for a legal conclusion, no response is required.

84.    Defendant denies the allegations in Paragraph 84 of the Complaint.  To the extent Paragraph 84 calls for a legal conclusion, no response is required.

85.    Defendant responds to the allegations of paragraph 85 of the Complaint by repeating his responses to Paragraphs 1 through 84 as if fully set forth herein.

86.    Defendant denies the allegations in Paragraph 86 of the Complaint.  To the extent Paragraph 86 calls for a legal conclusion, no response is required.

87.    Defendant denies the allegations in Paragraph 87 of the Complaint.  To the extent Paragraph 87 calls for a legal conclusion, no response is required.

88.    Defendant responds to the allegations of paragraph 88 of the Complaint by repeating his responses to Paragraphs 1 through 87 as if fully set forth herein.

89.    Defendant denies the allegations in Paragraph 89 of the Complaint.  To the extent Paragraph 89 calls for a legal conclusion, no response is required.

90.    Defendant denies the allegations in Paragraph 90 of the Complaint.  To the extent Paragraph 90 calls for a legal conclusion, no response is required.

91.    Defendant responds to the allegations of paragraph 91 of the Complaint by repeating his responses to Paragraphs 1 through 90 as if fully set forth herein.

92.    Defendant denies the allegations in Paragraph 92 of the Complaint.  To the extent Paragraph 92 calls for a legal conclusion, no response is required.

93.    Defendant denies the allegations in Paragraph 93 of the Complaint.  To the extent Paragraph 93 calls for a legal conclusion, no response is required.

94.     Defendant responds to the allegations of paragraph 94 of the Complaint by repeating his responses to Paragraphs 1 through 93 as if fully set forth herein.

95.     Defendant denies the allegations in Paragraph 95 of the Complaint.  To the extent Paragraph 95 calls for a legal conclusion, no response is required.

96.     Defendant denies the allegations in Paragraph 96 of the Complaint.  To the extent Paragraph 96 calls for a legal conclusion, no response is required.

97.     Defendant responds to the allegations of paragraph 97 of the Complaint by repeating his responses to Paragraphs 1 through 96 as if fully set forth herein.

98.     Defendant denies the allegations in Paragraph 98 of the Complaint.  To the extent Paragraph 98 calls for a legal conclusion, no response is required.

99.     Defendant responds to the allegations of paragraph 99 of the Complaint by repeating his responses to Paragraphs 1 through 98 as if fully set forth herein.

100.  Defendant denies the allegations in Paragraph 100 of the Complaint.  To the extent Paragraph 100 calls for a legal conclusion, no response is required.

101.  Defendant denies the allegations in Paragraph 101 of the Complaint.  To the extent Paragraph 101 calls for a legal conclusion, no response is required.

102.  Defendant responds to the allegations of paragraph 102 of the Complaint by repeating his responses to Paragraphs 1 through 101 as if fully set forth herein.

103.  Defendant denies the allegations in Paragraph 103 of the Complaint.  To the extent Paragraph 103 calls for a legal conclusion, no response is required.

104.  Defendant denies the allegations in Paragraph 104 of the Complaint.  To the extent Paragraph 104 calls for a legal conclusion, no response is required.

105.  Defendant denies the allegations in Paragraph 105 of the Complaint.  To the extent Paragraph 105 calls for a legal conclusion, no response is required.

106.  Defendant denies the allegations in Paragraph 106 of the Complaint.  To the extent Paragraph 106 calls for a legal conclusion, no response is required.

107.  Defendant denies the allegations in Paragraph 107 of the Complaint.  To the extent Paragraph 107 calls for a legal conclusion, no response is required.

108.  Defendant responds to the allegations of paragraph 108 of the Complaint by repeating his responses to Paragraphs 1 through 107 as if fully set forth herein.

109.  Defendant denies the allegations in Paragraph 109 of the Complaint.  To the extent Paragraph 109 calls for a legal conclusion, no response is required.

110.  Defendant denies the allegations in Paragraph 110 of the Complaint.  To the extent Paragraph 110 calls for a legal conclusion, no response is required.

111.  Defendant responds to the allegations of paragraph 111 of the Complaint by repeating his responses to Paragraphs 1 through 110 as if fully set forth herein.

112.  Defendant denies the allegations in Paragraph 112 of the Complaint.  To the extent Paragraph 112 calls for a legal conclusion, no response is required.

113.  Defendant responds to the allegations of paragraph 113 of the Complaint by repeating his responses to Paragraphs 1 through 112 as if fully set forth herein.

114.  Defendant denies the allegations in Paragraph 114 of the Complaint.  To the extent Paragraph 114 calls for a legal conclusion, no response is required.

115.  Defendant denies the allegations in Paragraph 115 of the Complaint.  To the extent Paragraph 115 calls for a legal conclusion, no response is required.

116.  Defendant responds to the allegations of paragraph 116 of the Complaint by repeating his responses to Paragraphs 1 through 115 as if fully set forth herein.

117.  Defendant denies the allegations in Paragraph 117 of the Complaint.  To the extent Paragraph 117 calls for a legal conclusion, no response is required.

118.  Defendant responds to the allegations of paragraph 118 of the Complaint by repeating his responses to Paragraphs 1 through 117 as if fully set forth herein.

119.  Defendant denies the allegations in Paragraph 119 of the Complaint.  To the extent Paragraph 119 calls for a legal conclusion, no response is required.

## FIRST AFFIRMATIVE DEFENSE

As an Affirmative Defense, the Complaint fails to state a claim on which relief can be granted.

## SECOND AFFIRMATIVE DEFENSE

As an Affirmative Defense, the Complaint is barred, precluded or limited, in whole or part, by the applicable statute of limitations, including, without limitation, the Copyright Act's three-year statute of limitations, 17 U.S.C. §507(b).

## THIRD AFFIRMATIVE DEFENSE

As an Affirmative Defense, the Complaint is barred, precluded or limited, in whole or part,  by the doctrine of laches because he has unreasonably delayed in bringing this Action to the presumed or actual prejudice of Defendant.

## FOURTH AFFIRMATIVE DEFENSE

As an Affirmative Defense, the Complaint is barred, precluded or limited, in whole or part, by the doctrine of waiver.

## FIFTH AFFIRMATIVE DEFENSE

As an Affirmative Defense, the Complaint is barred, precluded or limited, in whole or part, by the doctrine of estoppel.

## SIXTH AFFIRMATIVE DEFENSE

As an Affirmative Defense, the Complaint is barred, precluded or limited, in whole or part, by the doctrine of unclean hands.

## SEVENTH AFFIRMATIVE DEFENSE

As an Affirmative Defense, the Complaint is barred, precluded or limited, in whole or part, by a general release governing the claims at issue in this action.

## EIGHTH AFFIRMATIVE DEFENSE

As an Affirmative Defense the Complaint is barred, precluded or limited, in whole or part, by the doctrine of accord and satisfaction.

## NINTH AFFIRMATIVE DEFENSE

As an Affirmative Defense, the Complaint is barred, precluded or limited, in whole or part, by the doctrine of payment.

## TENTH AFFIRMATIVE DEFENSE

As an Affirmative Defense, the Complaint must be dismissed under Fed. R. Civ. P 19 for failure to include an indispensable party – *i.e.*, the non-party owners of the copyrights in the sound recordings at issue in this litigation.

## ELEVENTH AFFIRMATIVE DEFENSE

As an Affirmative Defense, the Complaint is barred, precluded or limited, in whole or part, by the doctrine of fraud on the United States Patent and Trademark Office.

## TWELFTH AFFIRMATIVE DEFENSE

As an Affirmative Defense, Plaintiff is estopped by its own acts, conduct, or omissions, from obtaining relief against the Defendant.

## THIRTEENTH AFFIRMATIVE DEFENSE

As an Affirmative Defense, Defendants asserts to the extent that any acts or omissions alleged in the Complaint occurred, Plaintiff authorized, licensed, or consented to it, expressly, by implication, or by conduct.

## FOURTEENTH  AFFIRMATIVE DEFENSE

As an Affirmative Defense, Plaintiff does not own some or all of the copyrights at issue in this action.  Plaintiff's claims are barred, precluded or limited, in whole or in part, by lack of standing.

## FIFTEENTH AFFIRMATIVE DEFENSE

As an Affirmative Defense, Defendant asserts that Plaintiff has failed to comply with the registration and other statutory requirements that are conditions precedent to maintaining claims under the Copyright Act, 17 U.S.C. §101, *et seq.*

## SIXTEENTH AFFIRMATIVE DEFENSE

As an Affirmative Defense, Defendant asserts that Plaintiff's claims under the Copyright Act, 17 U.S.C. §101, *et seq.*, fail to the extent that Plaintiff alleged he contributed to the creation, in whole or in part, of musical compositions performed by the Violent Femmes where such contributions consisted solely of his arrangements or performances thereof, since such contributions are neither original nor protectable expression.

## FACTS COMMON TO ALL COUNTERCLAIMS

120. Defendant and Plaintiff are founding members of the musical performing and recording group known as the "Violent Femmes" (Plaintiff and Defendant are hereafter jointly referred to herein as the "Group"). Since 1981, they have widely performed and recorded under the group name and mark the "Violent Femmes" throughout the United States and internationally (the "Mark").

**Origin of "Violent Femmes"**

121. In or about 1980-1981, Plaintiff and another musician named Victor Delorenzo formed a rhythm section for hire (bass and percussion) and performed locally as part of local musical groups, but had not performed as a musical band by themselves.

122. In or about 1981, Defendant and Plaintiff met while they were in high school in Milwaukee, Wisconsin. At the time, Defendant was a composer and musical performer.

123. Plaintiff and Delorenzo joined Defendant's group, forming its rhythm section, and the three performed under the name "Gordon Gano and the Violent Femmes." Thereafter, they agreed to shorten and change the group name to the "Violent Femmes."

124. Beginning in or about 1981, the Group performed at local events, such as Rufus King High School concerts, and at a local clubs such as the Beneath It All Café and the Jazz Gallery.

125. Defendant is now and has been since 1981 the lead guitarist and lead vocalist for the Group. Plaintiff has performed as bass guitar player and occasionally performs as a vocalist.

126. Defendant and Plaintiff have been the only permanent members of the Group. They have hired other performers to play drums during the Group's 26 year history, including the original drummer, Victor Delorenzo and later Guy Hoffman.

127. Delorenzo left the Group in 1993 to pursue a solo career under his individual name.

128. Hoffman has been an intermittent employee of the Group or corporations wholly owned by Defendant and Plaintiff.

129. Neither Hoffman nor Delorenzo have any rights to the Mark, nor have they asserted any claims to the Mark.

**Authorship of Violent Femmes Musical Compositions.**

130. Defendant has written almost all of the musical compositions performed or recorded by the Group during the past 26 years, including those described in Exhibit A to the Complaint ("Violent Femmes Compositions").

131. Defendant is the sole and exclusive author and copyright owner of all of these songs ("Gano Compositions"), with the exception of three songs co-written by Defendant and songwriter(s) other than Plaintiff,[1] one song co-written by Defendant with Plaintiff and other songwriter(s)[2], and six songs co-written by Defendant and Plaintiff.[3]

132. The songwriter credits contained on virtually every album or other recording made by the Group, which have been marketed and distributed under the authority of

---

[1] Catch-Em In the Act (Gano/Lou Reed); Gone Daddy Gone (Gano/Willie Dixon); Only The Lonely (Gano/Chris Frantz/Tina Weymouth/Jerry Harrison/T "Blast" Murray).

[2] Vancouver (Gano/Ritchie/Caleb Lentzner/Dominic Placco/Jerry Harrison/Mike Kashou/ Victor DeLorenzo).

[3] A Story; Color Me Once; Didgeriblues; Machine; Mosh Pit; When Everybody's Happy.

both Defendant and Plaintiff for the past 25 years, as well as every database reflecting publishing and writer credits (including the U.S. Register of Copyrights, public performance societies such as ASCAP and BMI, and All Music Guide), has contained writer and publisher credit consistent with the foregoing.

133.  Although Plaintiff was not an author or co-author of the Gano Compositions (apart from the seven described in footnotes 2 and 3 above co-authored by Plaintiff), for years Defendant paid Plaintiff a passive "income participation" in consideration for Plaintiff's services as an "arranger" of the performances of the Gano Compositions, pursuant to a long-standing agreement between Plaintiff and Defendant which was memorialized and ratified in paragraph 7 of the 2001 Agreement.

134.  Plaintiff's "income participation" was equal to 7.5% of Defendant's net receipts attributable to Defendant's authorship and ownership share of the Gano Compositions, received by Defendant from the license or other exploitation thereof , with the exception of "Gone Daddy Gone" (for which Plaintiff was paid an income participation of 16-1/4%).

135.  Plaintiff's passive "income participation" was not an acknowledgement of Plaintiff's contributions as an "author," which Plaintiff acknowledged for many years, since such contributions were neither original nor protectable expression entitling Plaintiff to copyright co-ownership or co-authorship.

136.  With respect to the seven musical compositions as to which Plaintiff made co-writer contributions, and the three songs co-written by Defendant and songwriters other than Plaintiff, such songs have been separately administered by the co-writers thereof, according to their respective authorship and ownership shares, including

Defendant (through Gorno Music), Plaintiff (through his publishing company Humidor Music), and the publishing administrators used by the other co-writers.

137.  The Violent Femmes Compositions were recorded by the Group and are included on at least eleven full length studio albums, which have been sold and distributed throughout the United States and elsewhere around the world using the Mark on their packaging, cover art, and promotional and marketing materials. Each album's liner notes credits Defendant as the lead vocalist and guitarist for the Group.

138.  Plaintiff has been aware of, and has never objected to, the manner in which Defendant was credited on these recordings, either as a musical performer or composer.

**History of the Mark "Violent Femmes."**

139.  During each of the past 26 years, with an occasional hiatus from time to time, Defendant and Plaintiff have performed as the "Violent Femmes" at thousands of musical concerts in various music clubs, college campuses and other concert venues throughout the United States and elsewhere around the world, averaging over 100 shows per year.

140.  In addition to exclusively and jointly using the Mark in the area of live entertainment services, namely as performers in a live musical group, Defendant and Plaintiff have also exclusively and jointly used or authorized the use of the Mark in connection with sound recordings and the sale of merchandise, including T-shirts and hats, and printed materials such as posters and concert programs.

141.  Defendant and Plaintiff have never separately used or authorized the use of the Mark in any of those areas.   During the past 26 years, both Defendant and Plaintiff have performed as live musical entertainers and recording artists on various projects

*separately*, on solo projects or as part of other musical groups.  However, they have not done so under the name "Violent Femmes" on any of those occasions.

142.  Upon information and belief, Plaintiff has not performed alone or with musicians other than Defendant under the name "Violent Femmes."  If there were such use of the Mark by Plaintiff, they were without the knowledge, authorization, authorization or acquiescence of Defendant.

143.  Plaintiff does not have any exclusive rights to the name and mark "Violent Femmes" separate from any rights he might have as a co-owner of that name with Defendant.

144.  The use of the Mark in interstate commerce by Defendant, as hereinabove set forth,   has been continuous and uninterrupted since 1981, and such use continues to the present.

145.  Defendant has never abandoned any claim to ownership of the Mark in International Classes 9, 16, 25 or 41, or otherwise in connection with other goods and services, either expressly or by implication.

**Plaintiff's Fraudulent Trademark Application.**

146.  On December 26, 2000, Plaintiff filed an application to register the Mark in the United States Patent and Trademark Office (the "Application").

147.  The application was filed in Plaintiff's own name in International Class 41. It identified the pertinent goods and/or services as "entertainment in the nature of live performances by a musical group; audio recording and production."

148. The Application contained a declaration signed by Plaintiff, sworn to November 16, 2000, in which Plaintiff stated as follows:

"Brian Ritchie swears that he believes that he is the owner of the mark sought to be registered; to the best of his knowledge and belief no other person, firm, corporation, or association has the right to use such mark in commerce, either in the identical form or in such near resemblance thereto as to be likely, when applied to the goods or services of such other person, to cause confusion, or to cause mistake, or to deceive; and the facts set forth in this application are true."

149.  Plaintiff's application stated he first used the Mark in commerce in 1980.

150.  Plaintiff's application stated he first used the Mark in interstate commerce in 1981.

151.  Plaintiff submitted no specimens with the Application evidencing his purported use of the Mark in commerce or interstate commerce as of 1980 or thereafter in International Class "entertainment in the nature of live performances by a musical group."

152.  Plaintiff submitted five specimens with the Application to evidence his purported exclusive use of the Mark in commerce or interstate commerce as of 1980 (in commerce) and 1981 (interstate commerce) International Class 41.

153.  The specimens were images of album cover artwork from Violent Femmes record albums, including the following:

- "Violent Femmes - New Times," an album originally released in 1994 by Elektra Entertainment, a Division of Warner Communications, Inc.;

- Violent Femmes - Add It Up (1981-1993)", a compilation album originally released in 1993 by Slash Records/Warner Bros. Records, Inc.;

- Violent Femmes – Viva Wisconsin," an album originally released in 1994 by Beyond Music;

- Violent Femmes – Freak Magnet," an album originally released in 2000 by Beyond Music.

154. All of the specimens submitted by Plaintiff showed the Mark as used by both Plaintiff and Defendant.

155. None of the specimens submitted by Plaintiff showed the Mark used by Plaintiff alone.

156. None of the specimens submitted by Plaintiff showed the Mark used by Plaintiff, alone or with any other person, at any time prior to 1982.

157. Plaintiff never used the Mark in interstate commence prior to 1981, either in the area of "entertainment in the nature of live performances by a musical group" or in connection with "audio recording and production."

158. As hereinabove alleged in greater detail, Plaintiff never used the Mark individually and/or exclusively in interstate commence after 1981 (without Gordon Gano), in the area of "entertainment in the nature of live performances by a musical group," in connection with "audio recording and production," or otherwise.

159. Plaintiff made sworn statements in the Application, including without limitation, his statements that he was the exclusive owner of the Mark, that he had used the Mark on an exclusive basis since 1980 and exclusively in interstate commerce since 1981, that there was no "other person, firm, corporation or association [who] had the right to use [the Mark] in commerce," and that the specimens he submitted showed the Mark as actually used by Plaintiff only as early as 1980 or 1981.

160. Such statements were false and were known by the Plaintiff to be false when he made them.

**Gano's Opposition to Plaintiff's Application; the 2002 Agreement.**

161.  On December 14, 2001, shortly after discovering the existence of the Application, Defendant commenced opposition proceedings no. 91150617 opposing the Application on the grounds that Plaintiff's claims that he had used the Mark individually and/or exclusively since 1981, and that no other person, firm, corporation, or association (e.g., Gordon Gano) had the right to use the Mark in commerce, were patently false and, as a result, that Defendant would be damaged by such registration of the Mark (the "Opposition").

162.  Prior to that time, and as part of the settlement of a number of internecine disputes between Plaintiff and Defendant, the parties entered into the 2001 Agreement which, in part, addressed the parties' respective mutual rights to the Mark, and their desire to reach an agreement in good faith as to whether either could use the Mark or a variation of the Mark independently of the other should the Group disband. No such agreement was ever reached.

163.  At that time, Plaintiff acknowledged and understood that, without Defendant's consent, he had no right to use the Mark or a variation of the Mark independently of Defendant.

164.  At that time he entered into the 2001 Agreement, Defendant was unaware that Plaintiff had filed the Application. Plaintiff did not disclose it to Defendant at any time.

165.  In early 2002, shortly after the filing of the Opposition, Robert Meloni, acting as counsel for Defendant, and Jeffrey Jacobson, acting as counsel for Plaintiff,

began discussions to resolve the trademark dispute, as well as other disputes that had then existed between Plaintiff and Defendant regarding the Group.

166. On or about April 1, 2002, Plaintiff and Defendant entered into the 2002 Agreement.

167. Plaintiff acknowledged in the 2002 Agreement that the Opposition had been sustained and the Application refused.

168. In the 2002 Agreement, Plaintiff expressly stated that he had "withdrawn his trademark application for 'Violent Femmes' [Serial #76191996]."

169. In the 2002 Agreement, Plaintiff further agreed that he would not file any State or Federal applications for registration of the service or trademark "Violent Femmes" without the prior written approval of Defendant.

170. Defendant never gave his consent or approval to Plaintiff for any such applications or similar filings.

171. In the 2002 Agreement, Plaintiff further agreed to release Defendant "from any or all claims, liabilities and obligations whatsoever, in law or equity, which one party shall or may have against the other or which any party may have against the other parties for, upon, or by reason of any matter, cause, or thing whatsoever from the beginning of the world, throughout the universe."

172. The only matter expressly excluded from the Release was the parties' obligations under paragraphs 6 and 7 of the 2001 Agreement. Indeed, by excluding these provisions, one of which governs the "publishing issues" relating to the Compositions, the 2002 Agreement ratified and affirmed those provisions of the 2001 Agreement.

173.  Apart from the parties' obligations under paragraphs 6 and 7 of the 2001 Agreement, the 2002 Agreement superseded all other agreements, written or oral between the parties relating to their respective rights and obligations relating to subject matter covered by the 2002 Agreement.

174.  The 2002 Agreement contained a merger clause which provided that it "set forth the entire understanding between the parties with respect to the subject matter hereof, and no modification, amendment, waiver, termination or discharge of this agreement shall be binding on any party unless confirmed by a written instrument signed by an officer or representative of any such party."

175.  The 2002 Agreement required Plaintiff, through his counsel, to execute a Joint Stipulation to be filed with the Trademark Trial and Appeal Board ("TTAB") which provided, *inter alia*, that "it was the mutual intention of both applicant and opposer that (i) the application should be withdrawn and deemed abandoned and (ii) the opposition proceedings should be dismissed without prejudice."

176.  On April 11, 2002, Jeffrey Jacobson filed a paper styled as "Request on Opposition" with the TTAB, representing that the parties jointly requested that the TTAB permit the Application as well as the Opposition to be withdrawn. That Request was signed by Jeffrey Jacobson, as "Attorney for Applicant [Brian Ritchie]".

177.  The TTAB misread that request and erroneously dismissed the Opposition with prejudice on May 30, 2002. On June 6, 2002, the TTAB issued a corrective order, acknowledging it's mistake in dismissing the Opposition, and vacating the May 30, 2002 order stating:

"Under the circumstances, the Board's May 30, 2002 order is vacated and applicant's abandonment of its application Serial No. 76191996 is noted. In view thereof, and because opposer's written consent to abandonment in not of record, judgment is hereby entered against applicant, the opposition is sustained and registration is refused."

178. Upon discovering the TTAB's June 6 order, Mr. Meloni contacted Mr. Jacobson to arrange for filing of the Joint Stipulation with the TTAB referred to in paragraph 2 of the 2002 Agreement.

179. Acting in reliance on Plaintiff's representations and agreements including his promise to withdraw the Application and not re-file it (or any other trademark application) as provided for in the 2002 Agreement, Defendant withdrew his opposition and advised the TTAB that the parties had agreed to dismiss the Opposition without prejudice.

180. On October 23, 2002, the parties filed a stipulated motion to vacate the TTAB's June 6, 2002 judgment order.

181. In the parties' stipulation, Defendant and Plaintiff formally advised the TTAB that Defendant sought to withdraw the Opposition without prejudice and Plaintiff sought the entry of abandonment of his application, Serial No. 76/191,996.

182. The TTAB thereafter issued an order dated January 29, 2003 stating as follows:

Inasmuch as the parties are in agreement as to the desired outcome of this proceeding and upon consideration of the parties' October 23, 2002 stipulation, the Board's June 6, 2002 judgment order is hereby vacated. In view thereof, application Serial No. 76/191,996 stands abandoned with prejudice and the opposition is dismissed without prejudice.

183. Unbeknownst to Defendant or his counsel, Plaintiff thereafter instructed his counsel to proceed with the prosecution of the Application, in blatant disregard of his

obligations under the 2002 Agreement and the Joint Stipulation filed with the TTAB, and with full knowledge of the falsity of the representations made in that Application, as hereinabove alleged.

184. On March 25, 2003, a registration for the Mark was issued by the U.S. Patent and Trademark Office in the name of Plaintiff, bearing registration no. 2699392 (the "Registration").

185. Defendant did not become aware of the issue of that registration until after the commencement of this Action.

## FIRST COUNTERCLAIM
### (Declaratory Judgment)

186. Defendant repeats and realleges the allegations in paragraphs 120 through 185 as if fully set forth herein.

187. The 2002 Agreement is a valid, binding and subsisting contract between Defendant and Plaintiff.

188. The Plaintiff's conduct is an anticipatory breach of, and refusal to perform obligations under, the 2002 Agreement.

189. The Declaratory Judgment Act, 28 U.S.C. §§ 2201, *et seq.*, authorizes this Court to declare the rights and legal relations of parties to an active controversy under its jurisdiction.

190. There is an actual, present and existing dispute between the parties concerning the Plaintiff's duties and obligations under the 2002 Agreement.

191.  The Court's determination of the issues presented herein would be final and conclusive, insofar as the declaratory judgment sought by Defendant would fully and finally resolve the parties' disputes concerning the 2002 Agreement.

## SECOND COUNTERCLAIM
### (Declaratory Judgment)

192.  Defendant repeats and realleges the allegations in paragraphs 120 through 191 as if fully set forth herein.

193.  The 2001 Agreement, solely to the extent of paragraphs 6 and 7 thereof, is a valid, binding and subsisting contract between Defendant and Plaintiff.

194.  The Plaintiff's conduct is an anticipatory breach of, and refusal to perform obligations under, the 2001 Agreement.

195.  The Declaratory Judgment Act, 28 U.S.C. §§ 2201, *et seq.*, authorizes this Court to declare the rights and legal relations of parties to an active controversy under its jurisdiction.

196.  There is an actual, present and existing dispute between the parties concerning the Plaintiff's duties and obligations under the 2001 Agreement.

197.  The Court's determination of the issues presented herein would be final and conclusive, insofar as the declaratory judgment sought by Defendant would fully and finally resolve the parties' disputes concerning the 2001 Agreement.

## THIRD COUNTERCLAIM
### (Cancelation of Trademark Registration)

198.  Defendant repeats and realleges the allegations in paragraphs 120 through 197 as if fully set forth herein.

199. Since as early as 1981, and continuing to the present, Defendant and Plaintiff have jointly and exclusively used, or jointly authorized others to use, the mark "Violent Femmes" on or in connection with goods and services in International Classes 9, 16 , 25 and 41, as defined in the Manual of Acceptable Identification of Goods and Services as set forth in the Trademark Manual of Examining Procedure, including without limitation, live performances, sound recordings and audio-visual works, apparel, and paper goods.

200. Defendant and Plaintiff are equal co-owners of the mark "Violent Femmes."

201. On March 25, 2003, a registration for the Mark was issued by the U.S. Patent and Trademark Office in the name of Plaintiff, bearing registration no. 2699392 (the "Registration").

202. The Registration was procured by Plaintiff through false and fraudulent statements, and in violation of the 2002 Agreement and Joint Stipulation, as more fully alleged above.

203. The use of the Mark by Plaintiff, to the exclusion of Defendant, would be unlawful since the Mark has come to signify both Defendant and Plaintiff together for at least the past 26 years, and not one performer or the other individually.  Any such use by Plaintiff alone would be deceptive, would cause consumer confusion, and would inevitably harm the good will associated with the Mark which Defendant has built during the past 26 years.  The Registration is part of a course of conduct by Plaintiff designed to perpetuate this fraud on the public and on Defendant.

204.  Accordingly, Plaintiff has no legitimate basis to claim that he has used the Mark individually and/or exclusively since 1980, or that no other person, firm, corporation, or association (e.g., Defendant) has the right to use the Mark in commerce.

205.  In light of the above, the representations by Plaintiff which resulted in the issuance of the Registration, which were patently false and made with the knowledge of their falsity, constitutes a fraud on the Trademark Office.

206.  Further, the Plaintiff's failure or refusal to withdraw and abandon the Application, and cause his counsel of record to execute the Joint Stipulation for filing with the TTAB, and instead to proceed to registration, was a material violation of the 2002 Agreement.

207.  Defendant respectfully that the Court issues and order under 15 U.S.C. §1119 canceling Plaintiff's Registration and directing the U.S. Patent and Trademark Office to make appropriate entry in the records of that Office consistent with such declaratory judgment.


### FOURTH COUNTERCLAIM
### (Breach of Contract)

208.  Defendant repeats and realleges the allegations in paragraphs 120 through 207 as if fully set forth herein.

209.  By filing his federal trademark application and obtaining the United States Trademark Registration No. 2699392 for the mark "Violent Femmes" Plaintiff has breached the 2002 Agreement.

210.  As a result thereof, Defendant has been damaged in an amount to be proven at trial, but in excess of the jurisdictional amount.

## FIFTH COUNTERCLAIM
### (Breach of Contract)

211.  Defendant repeats and realleges the allegations in paragraphs 120 through 210 as if fully set forth herein.

212.  By bringing this action seeking recovery for any claims arising and/or injuries sustained prior to April 1, 2002, including, without limitation, all claims seeking to void the 2001 Agreement, and all claims seeking a declaration of co-ownership of the copyrights to the sound recordings and musical compositions, Plaintiff has breached the 2002 Agreement.

213.  As a result thereof, Defendant has been damaged in an amount to be proven at trial, but in excess of the jurisdictional amount.

WHEREFORE, Defendant respectfully prays that the Court find in its favor and enter an order and judgment:

a.  Dismissing the Complaint in its entirety with prejudice on the merits;

b.  For declaratory judgments concerning the rights and other legal relations between the parties respecting the 2002 Agreement, as set forth herein;

c.  For declaratory judgments concerning the rights and other legal relations between the parties respecting the ownership of the trademark/service mark "Violent Femmes," as set forth herein;

d.  For a judgment cancelling the Registration of the trademark/service mark "Violent Femmes," bearing registration no. 2699392;

e.  For compensatory damages in an amount to be proved at trial;

f.  For the costs of suit and attorneys fees pursuant to 15 U.S.C. § 1117 and 17 U.S.C. § 505;

g.  For an award of sanctions as against Plaintiff and his counsel of record on the grounds that the Complaint is so clearly lacking in merit and any legal or factual foundation as to warrant the imposition of sanctions pursuant to Fed. R. Civ. P. 11 and 28 U.S.C. § 1927;

h.  For interest on its damages at the legal rate; and

i.  For such other and further relief that the Court may deem to be just and proper.

Dated: November 12, 2007

Yours, etc.,

MELONI & MCCAFFREY, P.C.

By:_____
        Robert S. Meloni (RM-8087)

1350 Avenue of the Americas - Suite 3100
New York, New York 10019
(212) 957-5577

*Attorneys for Defendant Gordon Gano*

# EXHIBIT A

**AGREEMENT**

AGREEMENT, made as of the 1st day of April, 2002 between **VF2, Inc.**, c/o MR Comart LLC, 450 Seventh Avenue, New York, New York 10123 ("VF2"), **Violent Femmes Touring, Inc.**, c/o MR Comart LLC, 450 Seventh Avenue, New York, New York 10123 ("VF Touring"), **Brian Ritchie**, residing at 60 Plaza Street, Apt. 4A, Brooklyn, New York 11238 ("Ritchie"), individually and as an officer and shareholder of VF2 and VF Touring, and **Gordon Gano**, residing at 256 West 10th Street #6A, New York, New York 10014 ("Gano"), individually and as an officer and shareholder of VF2 and VF Touring, on the following terms and conditions:

1.　　**VF2, Inc.:**

　　(a)　　Gano and Ritchie agree to execute the attached corporate resolution for VF2, which provides for limiting the corporate purposes of VF2 to the following: (1) as a holding company which will own and administer all intellectual property currently owned by VF2, including master recordings and master recording copyrights; and (2) to enter into agreements for the licensing or other exploitation of the foregoing assets.

　　(b)　　Gano and Ritchie agree that Jamie Kitman ("Kitman") will be nominated as the administrator of those assets, until a successor is nominated, provided that Kitman, or his successor, shall not have any authority to enter or execute into any agreements on behalf of VF2, to otherwise bind or commit VF2 to any obligation or undertaking, to receive any income on behalf of VF2, or to authorize any expenditures or payments from VF2's bank account(s), unless he obtains the prior written consent of both Gano and Ritchie. Kitman shall not receive any additional compensation for his services as administrator, other than the current 15% management commission payable to Hornblow Management. Any change in administration will require both Ritchie's and Gano's consent.

　　(c)　　Howard Comart will continue to act as accountant for VF2, until a successor is nominated. Any change (i.e., hiring or termination) in accountants or other professionals who render services to VF Touring will be made only in accordance with paragraph 1(h) of the Shareholder's Agreement.

2.　　**Violent Femmes Trademark**:

　　(a)　　Ritchie has withdrawn his trademark application for "Violent Femmes" [Serial #76191996] as to which Gano had commenced opposition proceedings [Opposition No. 91150617]. Gano and Ritchie were provided with a notice of

judgement from the Trademark Trial and Appeal Board ("TTAB"), dated June 6, 2002, which provided that Gano's opposition was sustained and that Ritchie's application for registration was refused.   Counsel for each of Gano and Ritchie shall execute a Stipulation for filing with the TTAB, in the form annexed hereto, which provides that (1) the TTAB sustained Gano's opposition in error; and (2) that it was the intention of both Gano and Ritchie that Ritchie's application should be withdrawn and abandoned;   and (3) that the opposition proceedings should be dismissed without prejudice.

(b)     Gano and Ritchie agree that neither will file any State or Federal applications for registration of the service mark or trademark "Violent Femmes" without the prior written approval of the other.

3.     **2002 Tour**:

(a)     Gano and Ritchie agree to form a new touring corporation (NY corporation), called "Violent Femmes Touring, Inc.,"  which will be owned 50/50 by Gano and Ritchie.

(b)     Gano and Ritchie agree to execute a Shareholders Agreement (the "Shareholders Agreement"),  in substantially the form attached hereto, which incorporates the following provisions:

(i)     The consent of both Gano and Ritchie is required for any corporate activities, including any commitments for the "Violent Femmes" (i.e., Gano and Ritchie) to perform at any live engagements, or for commercial endorsements and sponsorships;

(ii)     The consent of both Gano and Ritchie is required for the appointment of professionals and other employees or independent contractors who render services to the corporation, provided that Gano and Ritchie agree that VF Touring's business management, booking keeping and accounting work will be handled by Howard Comart;

(iii)     Any third party agreements which requires furnishing the services of Gano and Ritchie as the "Violent Femmes" for live engagements, tour sponsorships, commercial endorsements, or personal appearances, will be made and entered into by VF Touring f/s/o the "Violent Femmes" (i.e., Gano and Ritchie), and shall require the signatures of both Gano and Ritchie (except 2002 tour dates approved in advance by Gano and Ritchie,

as set forth herein, may be executed by Kitman on behalf of VF Touring).

(iv) All VF Touring income shall be paid into a separate bank account established in the name of VF Touring by the company's business manager.

(v) (1) Distributions of VF Touring Net Profits will be made at the discretion of Gano and Ritchie, and only with their mutual consent; provided however, that Howard Comart shall be authorized to make distributions to Gano and Ritchie, in equal amounts and at the same time only, of any Net Profits of the corporation no less frequently than a quarter-annual basis, and provided further that all corporate debts are first paid in full, and there is a reserve established and maintained in any year during which the Violent Femmes conduct a tour (including 2002) of not less than $7,500 to be used to cover any unanticipated or future corporate expenses. Such reserve shall be liquidated within three (3) months after the conclusion of the 2002 tour.

(2) Notwithstanding the foregoing, Gano and Ritchie hereby authorize Howard Comart to issue salary payments (less withholdings) to each of Gano and Ritchie, of an amount equal to $2,000 each for each show in which they perform and for which full payment is received by the Corporation. Such payments shall be made on a bi-weekly basis beginning with the second week of the 2002 tour cycle.

(3) "Net Profits," as used herein, shall mean gross revenues less all actual, direct out-of-pocket expenses reasonably incurred in connection with the 2002 tour, including without limitation, any fees paid to Gano and Ritchie in accordance with paragraph 3(b)(v)(2) above, transportation/hotels/lodging for crew members only, tour buses or vans (provided that there shall be only one tour bus used at any one time unless Gano and Ritchie both agree to use more than one), salaries to crew members and other employees, per diems, "sound and light" facilities, costs incurred in connection with "opening" acts, "support" acts and other performers employed or retained to appear before, with or after the Violent Femmes (if any), administration costs, accounting fees, management fees and any other corporate expenses incurred by the corporation in

connection with the approved purposes of VF Touring.

(4)     VF Touring shall also pay, on behalf of each of Gano and Ritchie, any expenses they separately incur during a tour for each of their ground and air transportation (excluding any tour bus and vans, which shall be a company expense), and their hotels and lodging, provided that such expenses shall be charged against the individual accounts of Gano and Ritchie, respectively.  Gano and Ritchie shall each have unfettered discretion as to the manner and class of such items (i.e., first class or economy air fare, luxury hotel or budget hotels, limo or car service, etc.).  Any such expenses incurred by one party shall be deducted from that party's respective share of Net Profits before payment of any distributions thereof to that party.

(c)    Gano and Ritchie  agree to perform as members of the "Violent Femmes" during a tour in 2002 under following conditions:

(i)    All dates are subject to Ritchie's and Gano's prior approval (and Gano's approval shall be in writing, via facsimile transmission or email, from Robert Meloni or any other person appointed by Gano).  Any approval (or rejection) of any proposed date shall be given in a timely manner after the date of written notice thereof.  Failure to approve any proposed date within five (5) business days from written notification thereof shall be deemed to be a rejection of that proposed date.

(ii)    Each date must meet the criteria set forth below.

(1)    Gano and Ritchie agree to perform up to the minimum number of engagements in each territory set forth below:

(A)    Twenty (20) U.S. dates which must occur within a 6 month period between May 1, 2002 and December 15, 2002 and within a limited geographic area (i.e., contiguous States).

(B)    Ten (10) European dates which must occur within a thirty (30) day period prior to December 15, 2002.

(C)    Ten (10 ) Australian/New Zealand dates which must occur within a thirty (30) day period prior to December 15, 2002.

(D)    All dates shall be subject to the personal or professional commitments of both Gano and Ritchie.  Without limiting the generality of the foregoing,  Gano is unavailable during

June 20-25, 2002 (family reunion planned).

(F)     Each date must guarantee a fee of not less than $25,000.

(G)     Neither Gano nor Ritchie shall be obligated to perform any dates after December 15, 2002, or any dates which do not meet the criteria set forth above (including without limitation, whether or not the minimum number of dates in each category are actually confirmed).

(H)     If the parties are unable to confirm and conclude performances for the minimum number of dates set forth above prior to December 15, 2002, but agree to additional dates which are to occur after December 15, 2002, then such additional dates shall also count in reduction of the minimum number of dates set forth above. In addition, if in their discretion the parties agree to perform an aggregate number of dates in excess of the minimum set forth above, whether such dates occur before or after December 15, 2002, such additional dates shall be subject to the terms of this agreement.

(2)     Notwithstanding anything to the contrary set forth above, if both Gano and Ritchie nevertheless accept a date which does not meet the foregoing criteria, it shall count in reduction of the minimum number of dates set forth above. Without limiting the generality of the foregoing, the following dates have been approved by Gano and Ritchie and shall count in reduction of the minimum number of dates set forth above:

| Date | Venue-Event | Fee |
| --- | --- | --- |
| 5/3/02 | St. Paul. MN-Midway Stadium | $35000.00 |
| 6/14/02 | Los Angeles, CA-Palace | $10000.00 |
| 7/7/02 | Milwaukee, WI-Summerfest | $25000.00 |
| 7/13/02 | Penn State University | $25000.00 plus expenses |
| 7/27/02 | Vail, CO-Venu Ford Park | $35000.00 plus expenses |

| Date | Venue-Event | Fee |
|------|-------------|-----|
| 8/15/02 | Anaheim, CA-House of Blues | $18500.00 |
| 8/16/02 | Ventura, CA-Ventura Theatre | $10000.00 |
| 8/17/02 | San Diego, CA-Del Mar Fairgrounds | $25000.00 |
| 8/18/02 | Chicago, IL-Goose Island | $35000.00 |

  (iii) Notwithstanding anything to the contrary set forth above, Gano and Ritchie acknowledge their approval of the promotional dates already performed for KROQ, R&R and the Rhino Records office event, for which no fees were or will be paid. These dates will not count towards the minimum number of dates set forth above.

 (d) Tour bus and van transportation: VF Touring shall pay for all transportation by bus (only one bus will be used) and/or vans for Gano, Ritchie and crew members on all road dates where such transportation is reasonably required or recommended by the road manager, and all ground transportation for crew members, Gano and Ritchie to/from airports-hotels and to/from hotels-venues. However, Gano and Ritchie may also arrange for their own separate ground transportation between dates (in lieu of bus or van transportation), and to/from airports/hotels/venues which shall be paid for the VF Touring, but which shall be charged against the individual accounts of Gano and Ritchie, respectively, in accordance with the terms of subparagraphs 3(b)(v) (3) and (4) hereof.

 (e) All Net Profits will be distributed to Gano and Ritchie in the manner set forth in paragraph 3(b)(v) above.

 (f) All cash receipts for the tour will be collected and handled by the road manager, and deposited into VF Touring's bank account through Howard Comart's offices.

**4.** **Miscellaneous provisions:**

 (a) The delay or failure by either party to exercise or enforce any of its rights under this Agreement shall not constitute or be deemed a waiver of that party's right thereafter to enforce those rights, nor shall any single or partial exercise of any such right preclude any other or further exercise thereof or the exercise of any other right.

 (b) This writing sets forth the entire understanding between the parties with respect to the subject matter hereof, and no modification, amendment, waiver, termination or discharge of this agreement shall be binding upon any party unless confirmed by a

written instrument signed by an authorized officer or representative of any such party.

(c)     The parties hereto acknowledge that, except as expressly set forth herein, no representations of any kind or character have been made to the other parties or by any of their respective agents, representatives or attorneys to induce the execution of this instrument. In order for each party to induce the other parties to sign this instrument, each party hereby releases the other parties from any and all claims, liabilities and obligations whatsoever, in law or equity, which the one party can, shall or may have against the other or which any party may have against the other parties for, upon, or by reason of any matter, cause, or thing whatsoever from the beginning of the world, throughout the universe. Notwithstanding the forgoing, the forgoing release shall exclude and not be applicable to any obligations any party may have under paragraphs 6 and 7 of the Agreement dated April 20, 2001bewteen Gano, Ritchie and VF2.

(c)     The headings of this Agreement, and any commentary contained in any footnotes herein, are solely for convenience of reference and shall be given no effect in the construction or interpretation of this Agreement.

(d)     If any provision, or portion thereof, of this Agreement is invalid under any applicable statute or rule of law, it is to that extent to be deemed omitted.

(e)     If any provision, or portion thereof, of this Agreement conflicts with any other provision, or portion thereof, the provision that appears to comply with the spirit of this agreement shall govern.

(f)     Subject to the above, this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns of substantially all the assets, rights and/or obligations of the party.

(g)     Nothing in this agreement shall make Ritchie an agent of Gano or VF2 or VF Touring.

(h)     Nothing in this agreement shall make Gano an agent of Ritchie or VF2 or VF Touring.

(i)     This agreement is intended by the parties hereto as a final expression of their agreement and understanding with respect to the subject matter hereof and as a complete and exclusive statement of the terms thereof and supersedes any and all prior and contemporaneous agreements and understandings relating thereto whether written or oral. This agreement may not be changed or modified, or any covenant or provision hereof waived, except by an agreement in writing signed by the parties hereto.

**SIGNATURE PAGE FOLLOWS**

**IN WITNESS WHEREOF**, the parties hereto have executed as of this 1st day of April, 2002.

**ACCEPTED & AGREED TO:**

Brian Ritchie, individually and as an
officer/shareholder of VF2, Inc. and
Violent Femmes Touring, Inc.


Gordon Gano, individually and as an
officer/shareholder of VF2, Inc. and
Violent Femmes Touring, Inc.

**IN WITNESS WHEREOF**, the parties hereto have executed as of this 1st day of April, 2002.

**ACCEPTED & AGREED TO:**

_____

Brian Ritchie, individually and as an
officer/shareholder of VF2, Inc. and
Violent Femmes Touring, Inc.

_____

Gordon Gano, individually and as an
officer/shareholder of VF2, Inc. and
Violent Femmes Touring, Inc.

**IN THE UNITED STATES PATENT AND TRADEMARK OFFICE**
**BEFORE THE TRADEMARK TRIAL AND APPEAL BOARD**

| In re Serial No. | : | 76191996 |
|---|---|---|
| For the Mark | : | VIOLENT FEMMES |
| Filed | : | December 26, 2000 |

GORDON GANO, Opposer                                              }
                                                                 }
                        v.                                       }          Opposition No. 91150617
                                                                 }
BRIAN RITCHIE CORPORATION, Applicant        }

TO:    BOX TTAB - FEE
       Assistant Commissioner for Trademarks
       2900 Crystal Drive
       Arlington, VA 22202-3513
       Attn.: Trademark Trial & Appeal Board

**JOINT REQUEST TO AMEND JUDGEMENT**

SIR:

        The undersigned attorneys for the parties to the above-entitled opposition hereby jointly request that the judgement entered in these proceedings be amended, for the reasons set forth below:

        1.    On or about April 8, 2002, the applicant filed a document with the Trademark Trial and Appeal Board ("TTAB") entitled "Request on Opposition" in which the applicant requested that the TTAB "permit the application as well as the opposition" to be withdrawn.

        2.    The TTAB issued its ruling in the above- entitled matter on May 30, 2002, finding that the opposition was dismissed based upon the "opposer's withdrawal of the opposition filed April 11, 2002."

        3.    Following a telephonic conference with counsel for opposer concerning the May 30, 2002 order,  in which opposer's counsel advised the TTAB that the May 30, 2002 was issued in error, the TTAB issued a subsequent finding dated June 6, 2002 which vacated the May 30, 2002 order and issued judgement against the applicant, sustaining the opposition and refusing

-1-

registration.

4.    Counsel for both parties believe that both the May 30, 2002 order and the June 6, 2002 order were in error and did not accurately reflect the intention the parties as to their mutual desire to withdraw both the application and the opposition, and to discontinue these proceedings without prejudice.

5.    Accordingly, it is hereby requested that the foregoing judgment be further amended to provide that it was the mutual intention of both applicant and opposer that (i) the application should be withdrawn and deemed abandoned and (ii) the opposition proceedings should be dismissed without prejudice.

Dated: July 25, 2002

Respectfully submitted,

_____
Robert S. Meloni
Attorney for Opposer Gordon Gano

_____
Jeffrey Jacobson
Attorney for Applicant Brian Ritchie

## VIOLENT FEMMES TOURING, INC.
## SHAREHOLDERS AGREEMENT

AGREEMENT, made as of the 1st day of April, 2002, by and among Violent Femmes Touring, Inc., a New York corporation, with an address c/o MR Comart LLC, 450 Seventh Avenue, Suite 2107 New York, New York 10123 (the "Corporation"), Gordon Gano, an individual having an address at 256 West 10th Street #6A, New York, New York 10014 ("Gano"), and Brian Ritchie, an individual having an address at 60 Plaza Street, Apt. 4A, Brooklyn, New York 11238 ("Ritchie") (Gano and Ritchie are sometimes referred to herein individually as a "Shareholder" and collectively as the "Shareholders").

### WITNESSETH

WHEREAS, the Corporation has been formed and is authorized to issue Two Hundred (200) shares of Common Stock, no par value per share, of which Two Hundred (200) shares will be issued and outstanding; and

WHEREAS, the Shareholders own, both beneficially and of record, all of the outstanding Common Stock of the Corporation (collectively, the "Shares") as follows:

| Name | Outstanding Shares |
|------|--------------------|
| Gano | 100 |
| Ritchie | 100 |

WHEREAS, the Shareholders desire to restrict the transfer or other disposition of their Shares and to provide for the management of the affairs of the Corporation.

NOW, THEREFORE, in consideration of the mutual promises and covenants contained herein, the parties agree as follows:

1.    BUSINESS; EXCLUSIVITY; CONTROL.

(a)    (i)    The Shareholders agree that the business of the Corporation shall be to engage the services of Gano and Ritchie, and such other individuals hired by the Corporation, to perform as the musical group professionally known as "Violent Femmes" (the "Band") in any live engagements, musical concerts, personal appearances, road shows, tours, café and cabaret performances, and to enter into agreements in connection therewith, such as commercial endorsement and tour sponsorship agreements (hereinafter "Band Activities"); and to perform such related activities using the name and mark "Violent Femmes" (the "Band Name"). The Band Name will be licensed to the Corporation by Gano and Ritchie, without payment,  solely in connection with Band Activities, but only so long as: (1) both Gano and Ritchie are members of the Band,  and (2) both Gano and Ritchie actually perform the Band Activities for which the Band Name is used; and (3) both Gano and Ritchie are shareholders in the Corporation.

(7.24.02)Violent Femmes Touring.Agt

1

(ii)  In furtherance of its purposes, but subject to all of the provisions of this Agreement, the Corporation shall have the power and is hereby authorized to enter into, perform and carry out contracts of any kind, including, without limitation, agreements for services of the Shareholders in connection with Band Activities only, and in that connection to grant licenses granting third parties the right to exploit the name and likeness of the Shareholders, in their capacities as members of the Band in connection with Band Activities only, as the Corporation may determine, and other agreements with any person or entity affiliated with any of the Shareholders, necessary to, in connection with, convenient to, or incidental to the accomplishment of the purposes of the Corporation.

(b)  The parties acknowledge and agree that this Agreement shall not restrict any of the Shareholders from engaging in the exploitation of their individual names, likenesses and biographical materials apart from the activities of the Band ("Outside Activities"), either on their own, or together with any other associates or affiliates, provided however, that the Band Name shall only be used in connection with Band Activities in accordance with this Agreement.

(c)  So long as the individual parties hereto remain Shareholders of the Corporation, they will:

(i)  Vote and continue to vote their Shares to elect and maintain a Board of Directors consisting of at least two (2) members, who shall be Gano and Ritchie.

(ii)  (A)  Vote and continue to vote as Directors of the Corporation so as to elect the following persons to the offices of the Corporation specified opposite their respective names:

| Name of Individual | Office |
| --- | --- |
| Gordon Gano | Co-President |
| Brian Ritchie | Co-President |

(B)  The Shareholders agree that, notwithstanding their election to such offices, it is their intention that no officer shall, solely by virtue of his election to and holding of such position (as opposed to liability arising due to actions taken by such officer), incur liability in excess of any other officer. If, notwithstanding such intention, such excess liability arises, each of the Shareholders agree that they shall be joint and severally liable for such excess liability.

(d)  Except as otherwise provided herein, at all meetings of the Shareholders, the holders of all of the issued and outstanding shares of the Corporation entitled to vote, present in person or represented by proxy, shall be necessary to, and shall continue a quorum for, the transaction of business unless such is waived in writing. Except as otherwise provided herein, all the outstanding shares entitled to vote shall be required for any action of the Shareholders. (7.2.02)Violent Femmes Touring.Agt

(e)     Except as otherwise provided herein, at all meetings of the Board of Directors, all of the members of the Board shall be necessary to and shall constitute a quorum for the transaction of business, and the unanimous vote of the entire Board shall be required for any action.

(f)     To the extent that the terms of this Agreement conflict with any of the provisions of the By-laws of the Corporation, the terms of this Agreement shall govern.

(g)     Notwithstanding anything contained in this Agreement, a unanimous vote of the Board of Directors or the Shareholders, as applicable, shall be required:

    (i)    To amend the Certificate of Incorporation of the Corporation;

    (ii)    To adopt any plan of merger, consolidation, liquidation or reorganization;

    (iii)    To issue any shares or other equity in the Corporation;

    (iv)    To amend the By-laws of the Corporation or the terms of this Agreement;

    (v)    To purchase, sell, grant, assign, pledge, compromise or otherwise transfer any interest in the Corporation or any of the other assets of the Corporation, except that the Shareholders agree that all checks, notes, drafts and other negotiable instruments shall be signed on behalf of the Corporation in the manner provided in the documents establishing the applicable accounts, subject only to the approval of all of the Shareholders at the time of execution of such documents;

    (vi)    To hire or fire employees, independent contractors or professionals who render services to the Corporation,  provided that either Gano or Ritchie may fire any employees, independent contractors or professionals (with or without cause) without the consent of the other (but only if a substitute employee is proposed and agreed upon by unanimous vote before any such employee is fired); and

    (viii)    To compensate any of the Shareholders for services provided to the Corporation, provided, however, that with respect to the tour cycle during the 2002 calender year only,  Gano and Ritchie hereby authorize Howard Comart to issue salary payments (less withholdings) to each of Gano and Ritchie, of an amount equal to $2,000 each for each show in which they perform and for which

(7.24.02)Violent Femmes Touring.Agt

full payment is received by the Corporation, on a bi-weekly basis
beginning with the second week of the 2002 tour cycle.

(ix)   The appointment of professionals, employees or independent
contractors who render services to the Corporation. Gano and
Ritchie agree that the Corporation's business management,
bookkeeping and accounting work will be handled by Howard
Comart.

(x)    To enter into any agreements which requires the furnishing the
services of Gano and Ritchie as the "Violent Femmes" for any
Band Activities, except that with respect to any tour dates booked
during the tour cycle during 2002, which are approved in advance
by Gano and Ritchie, as provided below, such agreements may be
executed by the Band's current manager, Jamie Kitman, on behalf
of the Corporation.

(h)    The Shareholders agree that profits of the Corporation shall be calculated
and distributed on a periodic basis, as decided by all of the members of the Board of Directors,
but no less frequently than on a quarter-annual basis. "Net Profits" shall mean gross revenues of
the Corporation less all actual, direct out-of-pocket expenses reasonably incurred in connection
with the Band Activities, including without limitation, any fees paid to Gano and Ritchie in
accordance with paragraph 1(i)(viii) above, air and ground transportation, tour buses or vans
(provided that there shall be only one tour bus used at any one time unless Gano and Ritchie both
agree to use more than one), hotels and lodging, salaries to crew members and other employees
and independent contractors, per diems, "sound and light" facilities, costs incurred in connection
with "opening" acts, "support" acts and other performers employed or retained to appear before,
with or after the Violent Femmes (if any), and any administration costs, accounting fees,
management fees and any other corporate expenses incurred by the Corporation in connection
with the approved purposes of the Corporation, and inclusive of a reasonable reserve of not less
than $7,500 to be used to cover any unanticipated or future corporate expenses. Such reserve
shall be liquidated within three (3) months after the conclusion of any tour cycle.

The Corporation shall pay, on behalf of each of Gano and Ritchie, any
expenses they separately incur during a tour for separate ground and air transportation
(excluding any tour bus and vans as well as transportation to/from airports and to/from hotels-
venues, which shall be the Corporation's expense), and their hotels and lodging, provided that
such expenses shall be charged against the individual accounts of Gano and Ritchie,
respectively. Gano and Ritchie shall each have unfettered discretion as to the manner and class
of such items (i.e., first class or economy air fare, luxury hotel or budget hotels, limo or car
service, etc.). Any such expenses incurred by one Shareholder shall be deducted from that
Shareholder's respective share of Net Profits before payment of any distributions thereof to that
Shareholder.

(7.2.02)Violent Femmes Touring.Agt

4

(i)    It is further acknowledged and agreed that all of the instruments, musical, sound and video equipment owned by any party hereto and used in connection with the activities of the Corporation shall continue to belong to such party, but during the term of this Agreement, the Corporation shall be entitled to the full use thereof, free of rent or other expense, except for insurance and necessary repairs, which shall be paid by the Corporation, unless otherwise agreed. All instruments, musical and/or sound, lighting, video and other equipment to be acquired for use in connection with the Corporation's activities shall be leased or purchased in accordance with the terms hereof.

## 2.    RESTRICTIONS ON SALE.

No Shareholder shall sell, assign, pledge, mortgage, hypothecate or otherwise transfer or permit to be transferred, either voluntarily or by operation of law, any of its Shares, or any shares of stock of the Corporation which it may subsequently own unless agreed by all of the other Shareholders in writing.

## 3.    INTENTIONALLY DELETED.

## 4.    INTENTIONALLY DELETED.

5.    LEGEND ON CERTIFICATES    Upon execution of this Agreement, all certificates of stock in the Corporation shall be endorsed as follows:

The Shares of stock represented by this certificate are subject to an agreement containing restrictions and limitations on the transferability of these Shares among the Shareholders of the Corporation and the Corporation. A copy of the agreement, and any amendments thereto, are on file at the office of the Corporation, and will be furnished upon request without charge to any holder of such Shares.

All certificates evidencing Shares of the Corporation hereinafter issued to any Shareholder, or to any person to whom such Shares have been transferred, shall bear the same endorsement, although any failure to endorse said certificate(s) shall not affect the applicability of this Agreement to the Shares and the Shareholders.

6.    NOTICES    All notices or options required or permitted to be given hereunder and the exercise of any options here under shall be in writing and shall be delivered personally or sent by registered or certified mail, return receipt requested, addressed to the party intended to be notified at the address of such party as it then appears on the records of the Corporation. The date of mailing of any such notice or option shall be deemed the date of the giving of such notice or the exercise of such option. Any party may change their address by giving notice as aforesaid. A courtesy copy of any notice to Gano shall be simultaneously sent to Robert S. Meloni, Esq., 405 Park Avenue, 15th Floor, New York, New York 10022. A courtesy copy of any notice to Ritchie shall be simultaneously sent to Jeffrey, Esq., Jacobson & Colfin, 19 West 21st Street, New York, New York 10019.
(7.24.02)Violent Femmes Touring.Agt

5

7.    NON-DISCLOSURE    Each Shareholder shall not, at any time during or after his association with the Corporation as an executive or an Officer, Director and Shareholder except when acting on behalf of and with the authorization of the Corporation, make use of or disclose to any person, corporation, or other entity, for any purpose whatsoever, any trade secret or other confidential information concerning the Corporation's business, finances, research, services or products (collectively referred to as the "Proprietary Information"). For the purposes of this Agreement, Proprietary Information shall mean information disclosed to the Shareholder or known by him as a consequence of his association with the Corporation, whether or not pursuant to Agreement, concerning the business, finances, methods, operations, corporate clients and services of the Corporation. The Shareholder acknowledges that Proprietary information, as it may exist from time to time, is a valuable and unique asset of the Corporation, and that disclosure of any such information would cause substantial injury to the Corporation. Each Shareholder agrees that he shall not make, publish or disseminate, in his capacity as a member or representative of the musical group "Violent Femmes," or of the Corporation, or of VF2, Inc., or as part of any "official" or "authorized" biography about or on behalf of the Violent Femmes (i.e., but excluding any biography or autobiography of an individual band member), any disparaging communications or comments of and concerning the other Shareholder. Each Shareholder, in any capacity, further agrees that he shall not make any disparaging communications or comments of and concerning the other Shareholder during any tour cycle. Each Shareholder, at any time and in any capacity, agrees that he shall not, make, publish or disseminate any comment of statement which is defamatory concerning the other Shareholder. The foregoing is not intended to limit the common law obligations of the State of New York relating to trade secrets and confidential information, to the extent such obligations exceed those provided herein.

8.    MISCELLANEOUS.

(a)    Entire Agreement. This Agreement contains the entire agreement of the parties, and no representations, inducements, promises or agreements, oral or otherwise, not embodied herein shall be of any force or effect. This Agreement shall supersede, replace and cancel all prior agreements and covenants not to compete, oral or written, entered into between the parties hereto, relating to the subject matter hereof, and any such prior agreements shall be of no further force or effect. This Agreement maybe amended, modified, superseded or canceled and the terms, covenants, representations, warranties or conditions/hereof may be waived only by a written instrument executed by all the parties hereto, or in the case of a waiver, by the party waiving compliance.

(b)    Governing Law. This Agreement shall be deemed to have been made in the State of New York and its validity, construction, performance and breach shall be governed by the laws of the State of New York applicable to agreements made and to be wholly performed therein. The parties agree to submit to the jurisdiction of the Federal or State courts located in New York County, State of New York, in any action which may arise out of this Agreement and said courts shall have exclusive jurisdiction over all disputes pertaining to this Agreement and all matters related thereto. The parties further consent that any process or notice of motion or other (7.2.02)Violent Femmes Touring.Agt

6

application to a court or to a judge may be served by registered or certified mail.

        (c)    Integration. This Agreement may be executed simultaneously or in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same Agreement.

        (d)    Supplemental Documents. Upon demand, the parties agree that they will execute and deliver any and all additional and supplemental documents and do such other acts and things which may be necessary or desirable to effect the purposes of this Agreement and the consummation of the transactions contemplated hereby.

        (e)    Severability. Should any part of this Agreement for any reason be declared invalid or unenforceable, such decision shall not affect the validity of any remaining portion, and such remaining portion shall continue in full force and effect as if this Agreement had been executed with the invalid or unenforceable portion eliminated.

        (f)    Successors and Assigns. This Agreement shall be binding upon and shall inure to the benefit of the parties and their respective personal representatives, permitted transferees, heirs, successors and assigns. If any person, firm or corporation shall acquire any shares of the Corporation from the Shareholders who have executed this Agreement, in any manner, whether by operation of law or otherwise, such shares shall be held subject to all of the terms of this Agreement, and by taking and holding such shares, such person, firm or corporation shall be conclusively deemed to have agreed to be bound by and to perform all of the terms and provisions of this Agreement.

        (g)    Waiver. A waiver of any breach or violation of any term, provision, agreement, covenant or condition herein contained shall not be deemed to be a continuing waiver or a waiver of any future or past breach or violation.

        (h)    Legal Counsel. Each of the parties acknowledge that they have consulted with or have been advised to consult with legal counsel of their own choosing and they fully understand each and every term and condition set forth in this Agreement.

## SIGNATURE PAGE FOLLOWS

(7.24.02)Violent Femmes Touring.Agt

**IN WITNESS WHEREOF**, the parties hereto have executed this Agreement on the day and year first above written.

VIOLENT FEMMES TOURING, INC.

By: _____
          Gordon Gano, an officer

VIOLENT FEMMES TOURING, INC.

By: _____
          Brian Ritchie, an officer

_____
          Gordon Gano

_____
          Brian Ritchie

(7.2.02)Violent Femmes Touring.Agt

8

**IN WITNESS WHEREOF**, the parties hereto have executed this Agreement on the day and year first above written.

VIOLENT FEMMES TOURING, INC.

By: _____

Gordon Gano, an officer

VIOLENT FEMMES TOURING, INC.

By: _____

Brian Ritchie, an officer

_____

Gordon Gano

_____

Brian Ritchie

(7.2.02)Violent Femmes Touring.Agt

8