UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
BRIAN RITCHIE, individually and d/b/a :
VIOLENT FEMMES, :
:
               Plaintiff, :   No. 07-CIV-7269 (VM)
:
        - against - :
:
GORDON GANO, individually and d/b/a GORNO :
MUSIC a/k/a GORNO MUSIC (ASCAP) a/k/a :
GORNO MUSIC PUBLISHING, :
:
              Defendants. :
-------------------------------------------------------------x

## DECLARATION OF GORDON GANO

    GORDON GANO declares under penalty of perjury as follows:

    1.    I am the defendant and counterclaim-plaintiff in the above-referenced action. I respectfully submit this declaration in opposition to the motion of Plaintiff Brian Ritchie ("Ritchie" or "Plaintiff") to disqualify my long-time litigation counsel Robert S. Meloni, Esq. (and vicariously, the law firm of Meloni & McCaffrey, P.C.) as my litigation counsel in this action.

    2.    My attorneys have advised me that Ritchie's disqualification motion is primarily based on his claim that there existed a so-called "Partnership" called the Violent Femmes (the "Band"), although he does not explain what the purpose of the partnership was, or what activities it undertook as a Partnership. It wouldn't matter. There is not now, and since as early as April 1983, there has not been a "Partnership" between Ritchie and me.

    3.    Since the date of the Band's first recording artist agreement in February 1983 to the present, the Band (originally consisting of Ritchie, Victor DeLorenzo and me, and after 1993 just Ritchie and me), conducted all of the Band's business activities through various

corporate entities. The only business activities we conducted as a band consisted of making and licensing sound recordings, licensing our band name and trademark "Violent Femmes" for merchandise uses, and performing live musical concerts. After 2002, certain Violent Femmes sound recordings were also owned by corporate entities of which Ritchie and I were the sole shareholders.

4. In the early years (1983-1993), we furnished our services as recording artists to Slash Records through a corporation called "Violent Femmes, Inc." which we formed on February 22, 1983.

5. Violent Femmes, Inc. entered into an exclusive recording agreement with Slash Records dated February 25, 1983 pursuant to which our recording artist services were furnished to Slash for the next 10 years. The term of that agreement lasted until February 1993.

6. For a period of less than one year prior to the formation of Violent Femmes, Inc., Mark Van Hecke, Victor De Lorenzo, Ritchie and myself were partners in a business known as Violent Femmes. The "business" was basically making records and performing live concerts under the name "Violent Femmes." However, pursuant to a "Bill of Sale" dated April 30, 1983, Violent Femmes, the partnership, sold and assigned "all of all of the rights, title and interest in the partnership known as 'Violent Femmes'" to Violent Femmes, Inc. A copy of that "Bill of Sale" is annexed hereto as Exhibit A. My attorneys have advised me that in his response to Defendant's First Request For Admissions dated May 30, 2008, Ritchie has admitted that (1) that his authentic signature appears on the Bill of Sale and that (2) I did not coerce his signature on that document.

2

7.     On April 30, 1983, contemporaneous with the Slash agreement, Ritchie, DeLorenzo, Mark Van Hecke and myself entered into an exclusive "Employment Agreement" with Violent Femmes, Inc., pursuant to which Ritchie, DeLorenzo, Van Hecke and myself were engaged by Violent Femmes, Inc. to provide our exclusive services as "entertainers" to Violent Femmes, Inc. for a term ending April 30, 1986, with such term being automatically renewed for one year periods unless terminated by the parties by written notice. Van Hecke served as record producer for the Violent Femmes recordings. A copy of that Employment Agreement is attached hereto as Exhibit B.

8.     On August 24, 1993, Ritchie and I formed our second furnishing company called "VF2, Inc." to serve the same business purpose as Violent Femmes, Inc.

9.     In April 1995, VF2, Inc. entered into a recording agreement with Interscope Records pursuant to which VF2, Inc. furnished our recording artist services to Interscope. The term of the Interscope Agreement ended on April 1, 1998, pursuant to a termination agreement signed by Ritchie individually and on behalf of VF2, Inc. My attorneys have advised me that in his response to Defendant's First request For Admissions dated May 30, 2008, Ritchie has admitted that his authentic signature appears on the Interscope termination agreement on the line for the signatory VF2, Inc.

10.    On June 1, 1999, VF2, Inc. entered into an exclusive recording agreement with Left Bank Records, Inc. d/b/a Beyond Music pursuant to which VF2, Inc. furnished our recording artist services to Beyond Music. My attorneys have advised me that in his response to Defendant's First request For Admissions dated May 30, 2008, Ritchie has admitted that it is his authentic signature on the Beyond Music Recording Agreement on the line for the signatory VF2, Inc.

11. In April 2001, Ritchie and I executed the 2001 Agreement whose purpose, in part, dealt with the proposed winding up of VF2, Inc. My attorneys have advised me that in his response to Defendant's First request For Admissions dated May 30, 2008, Ritchie has admitted that it is his authentic signature on page 5 of the 2001 Agreement. Paragraph 18 of the 2001 Agreement reads as follows: "Nothing in this agreement shall make Ritchie an agent of Gano or VF2. Nothing in this agreement shall make Gano an agent for Ritchie or VF2."

12. In April 2002, Ritchie and I executed the 2002 Agreement whose purpose, in part, dealt with the limiting of corporate purposes of VF2, Inc. to that of a holding company that would own and administer specific Violent Femmes intellectual property, consisting of master recordings and master recording copyrights then owned by VF2, Inc., but not the copyrights of musical composition copyrights written or owned by either me or Ritchie. My attorneys have advised me that in his response to Defendant's First request For Admissions dated May 30, 2008, Ritchie has admitted that his authentic signature appears on page 8 of the 2002 Agreement and that he signed the 2002 Agreement in both his individual capacity and as shareholder of VF2, Inc.

13. Pursuant to the 2002 Agreement all rights concerning the furnishing of the services of Gano and Ritchie as the Violent Femmes for purposes of touring, live engagements, commercial endorsements or personal appearances would be handled from that point onward by a corporation called Violent Femmes Touring, Inc. ("VF Touring") newly created by our then business manager, Howard Comart.

14. Prior to the formation of Violent Femmes Touring, Inc., all business relating to the Band's live engagements, commercial endorsements or personal appearances went through VF2, Inc.

4

15. As set forth in the 2002 Agreement, Howard Comart handled the business management, bookkeeping and accounting work for VF Touring. It is my understanding from an email I have reviewed from Howard Comart to Jeffrey Light, the Band's attorney, and Brian Ritchie dated June 24, 2004, Mr. Comart notified Ritchie that VF2, Inc. had been liquidated and all of its assets had been transferred to VF Touring. VF2, Inc. was formally dissolved on October 4, 2004. A copy of that email is annexed hereto as Exhibit C. VF Touring continues to handle all remaining business activities of the band Violent Femmes, including all that was previously handled by VF2, Inc.

16. Jeffrey Light, of the firm Myman Abell Fineman Greenspan & Light LLP in Los Angeles, has been the Band's attorney since as early as 1999, continuing to the present. With one recent exception, when an attorney named Daniel Weiss represented the Band in an isolated transaction not relevant here, Mr. Light handles all business and contract matters for the Band. Ritchie and I have separate counsel from time to time as well, but Mr. Light is the only attorney, other than Daniel Weiss, who has acted for the Band for the past 10 years.

17. The purported reference "Estimate of Meloni Charges" appearing in Alan Skiena's 2006 worksheet for "Gorno Music 2006 Gross Receipts," had nothing to do with purported legal services Mr. Meloni had performed for Ritchie, the Band or the so-called "Partnership." Ritchie's representative, Andrew Halbreich, was attempting to obtain confidential business records belonging to Gorno Music from Alan Skiena. Mr. Skiena found it necessary to ask Mr. Meloni for legal advice on Gorno Music's behalf concerning these unwarranted demands. As a result of Ritchie's improper conduct, I instructed Alan Skiena to recover a portion of the legal fees I estimated I would be required to pay Mr. Meloni as a surcharge on the money I was paying to Ritchie for that accounting period. It was my

understanding at the time that the surcharge would be offset against a discretionary bonus I was then considering paying Ritchie above what was otherwise required under our agreement. The line item referenced in Mr. Skiena's worksheet stated "Estimate for Meloni Charges: $1,200 - 3 hours at $400" referred to legal fees I estimated Mr. Meloni would bill me. Thus, Mr. Meloni never performed legal services for, or charged anything to, Ritchie, the Band or the so-called "Partnership."

18. Counsel for Ritchie makes an outrageous claim at Page 11 of their Brief which states as follows:

> "The Band does not have a formal fee arrangement with Meloni; however, by and through [the Band's] individual partners, the Band does pay for Meloni's legal services out of partnership proceeds. Specifically, a portion of the Band's revenue is derived from Gorno Music's administration of the Band's music catalog, from which the parties share in the profits and losses by way of 'income participation[s]."

Interestingly, I note that Brian Ritchie makes no such claim in his Declaration. He leaves it to his lawyers to make the claim by falsifying and distorting one line item of one page from Mr. Skiena's worksheet out of over 18,000 pages of documents I produced. That seems to be a recurring pattern in their papers.

19. First, "the Band" does not receive revenue directly from anyone. As stated above, all revenues paid by record companies for whom the Band made recordings, and by concert promoters that hired the Band to perform, have always been deposited into bank accounts in the name of the furnishing corporation that was a party to the agreements in question (*i.e.*, Violent Femmes, Inc. VF2, Inc., Violent Femmes Touring, Inc., *etc.*). Record royalties and concert tour receipts were paid into the corporate bank accounts, and our business manager would then, as instructed, pay corporate debts and make distributions to me and Ritchie.

6

20. Second, Gorno Music does not "administer the Band's music catalog." Ritchie's counsel is being intentionally vague on this point, as they obscure what the Band's "music catalog" actually is. I assume it does not refer to the catalog of <u>sound recordings</u> made by the Violent Femmes, which is not now and has never been administered by me or Gorno Music. Gorno Music has its own catalogue of <u>musical compositions</u>, and (except in a very small number of exceptions) only administers the copyright shares attributable to my authorship contributions, which in almost all cases is 100%. With the exception of the song "Vancouver," Gorno Music does not administer any shares of songs written or owned by Brian Ritchie. To the best of my belief, his company, called Humidor Music, performs administration services on his behalf, perhaps through third parties.

21. Years ago, I gratuitously agreed to pay Ritchie an "income participation" on the musical compositions I wrote, for which he made no contributions as an author. This is a common (although not universal) practice among bands, and is a way for the songwriter-member to reward those band members who only perform the songs on records or at live concerts. An "income participation" means nothing more than that Gorno Music pays Ritchie a small percentage of the net publishing income *Gorno Music earns* from the exploitation of the songs *I wrote*. It is not a "Band" activity at all. For example, other artists have performed or recorded my songs and I have been paid royalties from their sales of that recording for the right to do so. One recent example is a recording of the song "Gone Daddy Gone"[1] by the musical artist Gnarls Barkley which was contained on their album "St. Elsewhere" released in 2006.

---

[1] I wrote Gone Daddy Gone, and incorporated less than 25% of the lyrics from a pre-existing song by Willie Dixon. So the songwriter credits for Gone Daddy Gone are Willie Dixon (25%) and me (75%).

7

22.     Finally, to allege, as Ritchie's counsel has, that "the parties share in the profits and losses by way of 'income participation[s]'" is a complete falsehood. Ritchie has never agreed to share in any of the risks or expenses of Gorno Music. Ritchie is one of several people who receive either "income participations" on specific songs I wrote, as do Warren Bruleigh and Victor DeLorenzo, for example. Other parties receive a share of Gorno Music publishing revenues for one or more particular songs they co-wrote with me, or who wrote songs I incorporated into other songs I wrote (*e.g.,* Gone Daddy Gone). In some cases these co-writers administer their own shares of songs they co-wrote. For Ritchie, Humidor Music administers Ritchie's songwriter share of a small handful of songs he co-wrote.

23.     However, for the vast majority of songs written solely by me (or in a few cases me and other co-writers) where Ritchie receives an income participation, Gorno Music administers the songs (my songwriter interests only), and pays Ritchie directly a small percentage of my net publishing revenues as an income participation. There are a handful of songwriters who receive a co-publishing share (i.e., who co-own the song copyrights with me) or just an income participation (i.e., they have no copyright ownership) for songs performed by the Violent Femmes, which are administered by Gorno Music. These include Lou Reed, Caleb Lentzner, Jerry Harrison, Mike Kashou and Dominick Placco, whose names appear on the Gorno Music 2006 Gross Receipts statement submitted by Ritchie. These people are no more "partners" in Gorno Music or the "Violent Femmes" than they were members of the band Violent Femmes. Thus, Ritchie has never "shared" in any profits of Gorno Music, apart from the small income participation I voluntarily agreed to give him from my net publishing revenues.

8

24. I have reviewed Ritchie's claim concerning Mr. Meloni's purported representation of the "Partnership" Violent Femmes. The factual basis for this claim is that in 2003, Mr. Meloni submitted a creditor's proof of claim to a private liquidation company on behalf of "Gorno Music, VF2, Inc. and the Violent Femmes." At the time, Beyond Music had failed to pay mechanical (publishing) royalties it owed Gorno Music pursuant to two Mechanical License Agreements between Gorno Music and Beyond Music.

25. In addition, Beyond Music had failed to pay record royalties to VF2, Inc. from the exploitation of two Violent Femmes albums. I asked Mr. Meloni to file a proof of claim for Gorno Music at the time. Since there was an impending deadline to file these claim forms, and since no one else was prepared to do it, Mr. Meloni also filed a proof of claim on behalf of VF2, Inc., so VF2, Inc. did not lose its rights in bankruptcy. That filing was performed purely as a favor to me, and Mr. Meloni was not retained or paid for his services by VF2, Inc., Ritchie or "the Violent Femmes." In fact, the actual proof of claim form states that it is submitted on behalf of "VF2, Inc. d/b/a Violent Femmes" and not on behalf of any separate entity or purported partnership Violent Femmes. A copy of the form is attached to the Meloni Declaration as Exhibit E.. That explains Mr. Meloni's reference to the Violent Femmes in his cover letter concerning the proof of claim

26. I also understand that the second basis for disqualification is Mr. Meloni's representation of me as a defendant in this litigation at the same time he represents my long-time publishing administrator, Alan Skiena, as a non-party witness, which purportedly creates some form of concurrent conflict that purportedly requires Mr. Meloni's disqualification. However, prior to Mr. Meloni's agreement to represent Mr. Skiena as a non-party witness in this litigation, I was fully advised by Mr. Meloni of the full implications of the common

9

representation of both Mr. Skiena and me, including the potential for conflicts arising therefrom and, after intentionally foregoing an opportunity to review my decision with independent counsel, I have knowingly waived all conflicts that may arise from that representation.

27. Finally, I have no intentions of calling Mr. Meloni as a witness at trial. Any information he can provide is cumulative to testimony I, and a number of other witnesses can provide at trial. Moreover, if he were called by Ritchie as a witness at trial, nothing he could say would be adverse to my interests.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: July 3, 2008

_____
Gordon Gano

GANO Exhibit A

## BILL OF SALE

Know all men by these presents that the undersigned Mark Van Hecke, Victor DeLorenzo, Brian Ritchie and Gordon Gano are partners and sole owners in a business known as Violent Femmes, a partnership, and do hereby and by these presents on the 30th day of April, 1983, give, convey, sell, and transfer unto Violent Femmes, Inc., a Wisconsin corporation, all right, title and interest in said partnership and all appurtenances thereto and properties thereof, including without limitation all contractual rights, receivables, income, equipment, and other properties without limitation of said partnership.

_____
Mark Van Hecke, Partner, an individual

_____
Victor DeLorenzo, Partner, an individual

_____
Brian Ritchie, Partner, an individual

_____
Gordon Gano, Partner, an individual

GANO Exhibit B

EMPLOYMENT AGREMENT

Violent Femmes, Inc., a Wisconsin corporation, hereinafter "Employer", and Mark Van Hecke, Brian Ritchie, Victor DeLorenzo and Gordon Gano, hereby and do by these presents enter into an employment agrement for the employment of Ritchie, Gano, Van Hecke and DeLorenzo by Employer this 30th day of April, 1983.

1.  Van Hecke is employed as Producer for Violent Femmes, Inc.

2.  Gano, Ritchie and DeLorenzo are employed as and for entertainers and grant unto Employer sole and exclusive rights to their services throughout the term of this agreement.

3.  This agreement shall take effect May 1, 1983 and continue uninterrupted through the last day of April of 1986.

4.  This agreement shall, after and subsequent to the last day of April, 1986, be automatically renewed for sucessive twelve month periods unless the parties hereto shall elect not to continue such agreement, in which event such parties shall inform the Employer not less than sixty days prior to the end of the initial term of this agreement or not less than sixty days prior to the completion of any renewal term hereof in writing by certified mail. Nonrenewal by one party hereto does not constitute effective notice of nonrenewal as to any other party hereto; employees shall be allowed reasonable vacation time annually at an absolute minimum of three (3) weeks.

5.  In consideration for such services the Employer promises to pay, on at least an annual basis, with such advances thereon as shall be deemed reasonable by Employer's Board or, in the absence of agreement as to such advances, with such advances thereon as shall be deemed reasonable by Employer's President:

    a) For live performances of any entertainer or for recorded performances involving more than one of the entertainers, resulting in monies paid

Employer, one third each of net profits to Ritchie, Gano, and DeLorenzo, except

b) For merchandising of souvenirs and the like and for recorded performances of which Van Hecke is producer, resulting in monies paid to Employer, one quarter each of net profits to Ritchie, Gano, DeLorenzo and Van Hecke, and

c) For Van Hecke, one quarter of merchandising proceeds from May 1, 1986 through the last day of April of 1990 and one quarter of net profits of recorded performances of which he is producer from May 1, 1986 through January 1, 2000.

Van Hecke is guaranteed to be producer of the Violent Femmes' second album. *All royalties due VanHecke must not be used to finance any recordings of which he is not producer and should be paid before any other money earned is paid out.* [handwritten initials] GG MVH BR VJD

6. For purposes of calculating net profit there shall be charged against each of the foregoing categories of income such expenses as are most reasonably related to such income. Any dispute with respect to such allocation or with respect to any issue arising hereunder shall be arbitrated by the American Arbitration Association and in accordance with its rules.

7. It being recognized by each and every signatory hereto that significant monies and effort are commonly made on behalf of a corporation in the entertainment business for the enhancement of the personal following of entertainers employed by it, and that the following of such entertainers among the populace is a valuable asset of such an employer, and it being further understood that historically disputes and dissension have caused severe damage to many such businesses by virtue of an individual having acquired a significant following and then desiring to leave the service of such corporation, it is acknowledged by all parties signatory hereto that restriction of competition subsequent to the termination of this agreement and during its duration is reasonable and

necessary and in the best interests of the entertainers and the corporation mutually. Thus the entertainers for good and valid consideration, receipt of which is acknowledged, and by virtue of the mutual promises and covenants herein do promise and each of them not to compete with the business of the corporation within the prescribed territory for the period of time set forth hereinafter. It is acknowledged that the period of time of noncompetition, the territory, and the definition of employer's business as described herein are entirely reasonable and acceptable in light of the purposes of this contract and for purposes of the protection of the business of the corporation. It is further understood that this portion (#7 and its subsections) of this agreement shall be null and void if by May 1, 1985, gross earnings of Employer have not exceeded $300,000.

    a) The period during which no entertainer shall compete in the business of the corporation is the period of this contract, and of any renewals thereof, plus one year from the date of termination of this contract or any renewal thereof.

    b) The territory within which entertainers shall not compete is that of the continental United States, Alaska and Hawaii.

    c) The business of employer is defined as that of making, producing, selling, distributing, or otherwise profiting in any way from, musical entertainment.

    d) This agreement shall be governed by the laws of the State of

Wisconsin.

_____
Mark Van Hecke

_____
Brian Ritchie

_____
Gordon Gano

_____
Victor DeLorenzo


VIOLENT FEMMES, INC.

By _____
Mark Van Hecke

By _____
Brian Ritchie

GANO Exhibit C

Michele Macklis

From: Jeffrey Light
Sent: Thursday, June 24, 2004 6:55 PM
To: Michele Macklis
Subject: FW: * Violent Femmes - Greatest Hits & DVD Projects (Slash records)

-----Original Message-----
From: Howard Comart [mailto:HowardC@mrcomart.com]
Sent: Thursday, June 24, 2004 5:50 AM
To: Jeffrey Light; 'Brian Ritchie (E-mail)'
Subject: RE: * Violent Femmes - Greatest Hits & DVD Projects (Slash records)

P.S. FYI--VF2, INC. HAS BEEN LIQUIDATED. WHATEVER IT HAD IS NOW IN VIOLENT FEMMES TOURING, INC.

-----Original Message-----
From: Howard Comart
Sent: Thursday, June 24, 2004 8:41 AM
To: 'Jeffrey Light'; Brian Ritchie (E-mail); Howard Comart
Subject: RE: * Violent Femmes - Greatest Hits & DVD Projects (Slash records)

HI JEFFREY

1-DISCUSS YOUR INVOLVEMENT WITH GORDON OR BRIAN
2-TO THE BEST OF MY KNOWLEDGE, GORDON DOES NOT HAVE E-MAIL. WE FAX HIM.

**Howard Comart**
**Howard I. Comart, CPA**
Managing Director

**M*R*Comart LLC**
Certified Public Accountants & Financial Advisors
*Business Management Services for the Entertainment & Sports Communities*

450 Seventh Avenue
New York, NY 10123-1701
Tel: 212-563-3100 ext. 211
Fax: 212-563-2997
E-Mail: howardc@mrcomart.com

*This e-mail and all attachment(s) are confidential and intended solely for the use of the individual or entity to whom they are addressed. If you have received the message in error, please advise the sender by reply e-mail and delete this message. Thank you very much.*

-----Original Message-----
From: Jeffrey Light [mailto:JLight@mafg.com]
Sent: Wednesday, June 23, 2004 9:34 PM
To: Brian Ritchie (E-mail); Howard I. Comart (E-mail)
Subject: * Violent Femmes - Greatest Hits & DVD Projects (Slash records)

Guys, this is news to me. Would you like me to get involved? BTW, does Gordon have an e-mail address yet?

-----Original Message-----
From: Sanchez, Gladys [mailto:Gladys.Sanchez@wmg.com]
Sent: Wednesday, June 23, 2004 4:36 PM
To: Jeffrey Light
Cc: Gates, Craig
Subject: Violent Femmes - Greatest Hits & DVD Projects

5/2004



Dear Jeffrey:

As you may be aware, Warner Strategic Marketing is planning to release a Violent Femmes Greatest Hits and DVD project. The project details on the Greatest Hits are as follows:

| | |
|---|---|
| Title: | Greatest Hits (Tentative) |
| Release Date: | August 2004 (tentative) |
| SRLP: | $11.98 CD |
| # of tracks: | 16 |
| Artist Royalty: | Will be pursuant to the applicable recording agreement between Artist and Slash (i.e. 11% or 12%, as the case may be, less free goods; except that said royalty shall be subject to a 25% packaging deduction). I will be sending you a letter to clarify the that royalty rate will be subject to a standard 25% packaging deduction. |

Mechanical Cap: Will be pursuant to the applicable recording agreement between Artist and Slash (i.e. 10 x 75% of min. stat. rate).

We will need to establish the video rate for the DVD. I will send you a proposal for your review and comments. If all is in order, please advise and I will forward four (4) execution copies of said proposal to your attention for signature. Should you have any questions regarding the aforementioned, please do not hesitate to contact me at your earliest convenience. Thank you, Jeffrey. I look forward to working with you on these projects.

Kind regards,
Gladys Sanchez
Warner Strategic Marketing Inc.
Business Affairs
3400 W. Olive Avenue
Burbank, CA 91505
Ph: 818-238-6112
Fax: 818-562-9239

/25/2004